722 P.2d 989
**Jorge A. TABORA, M.D.,**
**Plaintiff-Appellee,**

v.

**STATE of Arizona and the Board of Medical Examiners; Bruce Babbitt, Governor; James E. Brady, Jr., M.D.; Steven S. Spencer, M.D.; Mario P. Valdez, M.D.; Douglas N. Cerf; and David O. Landrith, Defendants-Appellants.**

**No. 1 CA–CIV 8382.**

Court of Appeals of Arizona,
Division 1, Department B.

July 3, 1986.

---

Estrada & Estrada by Cynthia R. McCormick, Phoenix, for plaintiff-appellee.

Robert K. Corbin, Atty. Gen. by Anthony B. Ching, Asst. Atty. Gen., Phoenix, for defendants-appellants.

## OPINION

CONTRERAS, Judge.

We consider whether there was sufficient evidence to support the finding by the Board of Medical Examiners of the State of Arizona (the Board) that Dr. Jorge Tabora engaged in a pattern of charging excessive fees and whether Dr. Tabora had adequate notice that the Board might order him to review his records, provide restitution, and submit a report of restitution. Although we conclude that there was sufficient evidence to support the Board's findings and its decision regarding professional conduct, we are of the opinion that Dr. Tabora did not receive adequate notice that the Board might enter a broad restitution order. The judgment is therefore affirmed in part and reversed in part.

## BACKGROUND

Dr. Tabora is an anesthesiologist and is licensed to practice medicine in Arizona. The Board received complaints from two of Dr. Tabora's patients, alleging that Dr. Tabora charged them excessive fees in May, 1982 and in January, 1983. In response to the first complaint, the Board filed a letter of concern. In response to the second complaint, Dr. Tabora reduced his bill to that complainant by $28.00 to reflect a one unit overcharge; according to Dr. Tabora's records, the complainant's surgical procedure was assigned a value of fourteen units, but the patient was charged for fifteen units. Dr. Tabora's response to the second complaint prompted the Board's investigation.

On July 22, 1983, the Board requested that Dr. Tabora produce records relating to the patients under his care during February, 1983. This period of time was randomly selected. The Board indicated that its staff would review those records "to ascertain whether or not the number of units charged coincided with the information on the patient records...."[1]

Dr. Pent, a consultant to the Board, reviewed the records of the twenty-five patients treated by Dr. Tabora during February, 1983. He then met with Dr. Tabora and Dr. Tabora's office manager, Rick Jacobs, to discuss his review of the February 1983 records. Dr. Pent submitted a written report to the Board, summarizing his investigation. There is no transcript of the meeting and no copy of the written report by Dr. Pent in the record.

On September 19, 1983, the Board requested an informal interview with Dr. Tabora on November 30, 1983, and advised Dr. Tabora that he could be represented by counsel:

> The purpose of this interview will be to discuss your charges for anesthesia as it relates to [the January, 1983 complainant] and other patients which were discussed with you by Doctor Pent. Please be advised that you may be represented by counsel of your choice at this or any other meeting scheduled by the Board. As explained in A.R.S. § 32–1451(E), which is reprinted in the current Arizona State Medical Directory published by the Board, this interview could result in disciplinary action against you.
>
> You may wish to note that to comply with the State's Open Meeting Law, the Board's meetings and interviews are conducted in Open Session with representatives of the news media and the public oftentimes in attendance.
>
> It would be appreciated if your acceptance or refusal of this request would be made in writing and filed with this Board within ten (10) days of the date of this letter.

Dr. Tabora accepted the Board's request for an informal interview on October 5, 1983. On October 7, 1983, the Board specified in a letter to Dr. Tabora that it would be reviewing "all cases handled by you during February, 1983" and that "you may wish to bring pertinent records...." The Board sent another letter on November 15, 1983, to remind Dr. Tabora of the informal interview. At the informal interview, Dr. Tabora was not represented by counsel and apparently did not bring any records.

On December 15, 1983, following the informal interview, the Board issued a Decree of Censure and Order for Restitution. In the Decree, the Board found that Dr. Tabora engaged in a pattern of excessive billing and concluded that this constituted unprofessional conduct within the meaning of A.R.S. 32–1401(8)(s).[2] Dr. Tabora was ordered to review his 1983 cases, provide restitution to all patients and/or insurance carriers affected by appropriate reductions or changes in his bills, and submit a report of restitution to the Board:

### FINDINGS OF FACT

....

### III

A review of JORGE A. TABORA, M.D.'s February 1983 anesthesia cases

---

1. The Board also indicated that its staff would be "noting whether or not the record indicated visitation with the patient by the anesthesiologist prior to surgery." The Board was concerned that the periods of time allegedly spent by Dr. Tabora with his patients prior to administering the anesthetic were excessive. Later, the Board excluded this concern from those addressed in its Decree of Censure and Order of Restitution.

2. A.R.S. § 32–1401(8)(s) defines unprofessional conduct:

Charging or collecting a clearly excessive fee. In determining the reasonableness of a fee, the fee customarily charged in the locality for similar services shall be considered in light of modifying factors, such as the time required, the complexity of the service and the skill requisite to perform the service properly. This subdivision does not apply if there is a clear written contract for a fixed fee between the physician and the patient which has been entered into prior to the provision of service.

indicates a pattern of excessive billing evidenced by unreasonably high unit charges and inaccurately assigned high value classifications for surgical procedures attended and patients' physical status.

. . . .

### CONCLUSIONS OF LAW

. . . .

### VI

The conduct of JORGE A. TABORA, M.D. described in Paragraph III hereof constitutes unprofessional conduct within the meaning of A.R.S. § 32–1401(8)(s).

. . . .

### ORDER

. . . .

IT IS FURTHER ORDERED, pursuant to A.R.S. § 32–1451(E)(3), that JORGE A. TABORA, M.D.: (1) review the records of all his cases during calendar year 1983 to determine appropriate reductions of his unit values for anesthesia time, appropriate changes of value classifications of surgical procedures billed, and appropriate changes in the classifications of patients' physical status as affecting billing; (2) provide restitution to all patients and/or insurance carriers affected by such reductions and changes; and, (3) submit to the Board of Medical Examiners of the State of Arizona by 1 March 1984 a written report indicating the amounts returned, the persons or companies for whom such billing adjustments were made, and the reasons for each such billing adjustment.

In the Decree, the Board also found that Dr. Tabora had attended two patients at once, concluded that this constituted unprofessional conduct within the meaning of A.R.S. § 32–1401(8)(o),[3] and ordered that he be censured for his excessive fees and overlapping attendance.

Dr. Tabora, with the assistance of counsel, petitioned for rehearing. The Board met with Dr. Tabora and his counsel to discuss the petition. During that meeting, counsel to the State of Arizona clarified the restitution order, setting out four circumstances in which Dr. Tabora should provide restitution:

> It would be the State's position that given the nature of the cases that were discussed with Doctor Tabora at the informal interview that in effect what was being required was that the doctor review his records for 1983 for [1] any cases in which a patient was billed more units than the actual time that was spent with the patient, [2] any cases in which more than one patient was billed for the same period of time, [3] any cases in which the patient was billed according to an erroneously high physical status classification given the patient's actual physical status and [4] any cases in which the unit value for the particular procedure was increased due to the listing of a procedure that according to the surgeon's operative note was not in fact performed.

The Board denied Dr. Tabora's petition for review.

Dr. Tabora appealed the Decree to the superior court, pursuant to A.R.S. §§ 12–904, –905, and requested a trial *de novo*, pursuant to A.R.S. § 12–910. The superior court denied his request for a trial *de novo*.

Following oral argument by the parties, the superior court concluded that there was insufficient evidence to support the Board's finding of a pattern of charging excessive fees and that Dr. Tabora did not have adequate notice that the restitution order might be imposed:

> IT IS THE COURT'S CONCLUSION that there was insufficient evidence before the Board to support its expansive finding of fact No. III, and that there was not adequate notice to Dr. Tabora prior to the informal interview to fairly apprise him that the Board might enter

---

**3.** A.R.S. § 32–1401(8)(*o*) provides that unprofessional conduct includes "[a]ny conduct or practice which is or might be harmful or dangerous to the health of the patient."

an order of the type contained in the second paragraph of its order of December 15, 1983, covering the entire calendar year 1983, and requiring him, without further specification, to undertake to conduct the type of review and restitution therein ordered.

Thus, the superior court vacated the Board's finding of excessive fees, the conclusion of unprofessional conduct pursuant to A.R.S. § 32–1401(8)(s), and the restitution order. The superior court affirmed the other findings, conclusions, and the censure order.

The Board has appealed the superior court's decision.

## (1) SUFFICIENCY OF THE EVIDENCE

As clarified during the Board's meeting concerning Dr. Tabora's petition for rehearing, the Board was concerned that Dr. Tabora's fees were excessive in the following four circumstances—

(1) when Dr. Tabora charged a patient for more units than were reflected in his records;

(2) when Dr. Tabora charged more than one patient for the same period of time;

(3) when Dr. Tabora charged a patient based on an erroneous classification of the patient's physical status; and

(4) when Dr. Tabora charged a patient based on a surgical procedure which according to the surgeon's operative notes was not performed.

In reviewing Dr. Tabora's records concerning his twenty-five February 1983 cases, Dr. Pent found cases involving each of these four circumstances.

During the informal interview, Dr. Pent informed the Board that in one case Dr. Tabora charged a patient for six units although his records only assigned five units to the surgical procedure. Dr. Tabora did not address that case directly.

Dr. Pent told the Board about a case in which, forty minutes before one patient's mammoplasty ended, Dr. Tabora left that patient to attend another patient undergoing a pulmonary lobectomy. Thus, for forty minutes, Dr. Tabora was attending both patients. In addition to their concern for the potential danger to the patients, two Board members expressed their concern that Dr. Tabora was charging for services that he did not in fact provide. Dr. Tabora explained that he was "just across the hall" from the mammoplasty patient and that his conduct was "common practice" among anesthesiologists.

Dr. Pent also told the Board that Dr. Tabora had classified two patients as having a physical status of 3, which indicates severe systemic disease. Dr. Pent did not think those classifications were supported by Dr. Tabora's records of the patients' histories and physical conditions. Dr. Tabora responded that doctors classify according to their own evaluations. Dr. Pent asked Dr. Tabora about one of those two patients, whose records indicated that he had no major illnesses. Dr. Tabora responded that he could not recall that patient.

Dr. Pent related to the Board a case in which Dr. Tabora charged for a thoracoplasty, a complex chest surgery, even though the surgeon's operative notes did not list thoracoplasty as a procedure. Apparently, a pleural tent was performed. Dr. Pent recounted that when he previously discussed this case with Dr. Tabora, Dr. Tabora stated that he had charged for the thoracoplasty because the surgeon had told him prior to surgery that a thoracoplasty would be performed.

During the informal interview, Dr. Tabora initially stated that he did not recall the case exactly, and that he thought a thoracoplasty was performed. One Board member stated that "it's inconceivable to me that you could be administering anesthesia to a patient and not know whether or not a thoracoplasty was being done on that patient." Dr. Tabora also stated that it did not matter whether a thoracoplasty was performed because, according to the guidelines, a pleural tent and a thoracoplasty were both assigned a unit value of fifteen. Dr. Pent responded that all procedures on

the pleura, except removal procedures, were assigned a unit value of thirteen. Dr. Tabora then stated that he thought a pleurectomy was performed, because the pleura was cut to make a pleural tent. At that point, three of the doctors on the Board expressly disagreed with Dr. Tabora, noting that "ectomy" meant "removal of."

█ In summary, the Board became concerned about Dr. Tabora's fees, based on Dr. Tabora's admission of incorrectly charging the January 1983 complainant. It randomly selected his February 1983 cases to investigate. Out of those twenty-five cases, Dr. Pent found six cases in which Dr. Tabora's records did not support the fees actually charged. Dr. Tabora did not dispute the accuracy of Dr. Pent's testimony concerning any of the records. In each of those cases, the Board concluded that Dr. Tabora was charging a clearly excessive fee. We find that there was substantial evidence to support the Board's finding of a pattern of excessive billing and the Board's conclusion of unprofessional conduct within the meaning of A.R.S. § 32–1401(8)(s). *Cf. Howard v. Nicholls,* 127 Ariz. 383, 388, 621 P.2d 292, 297 (App.1980) (the court of appeals must affirm the decision of an administrative agency if there is substantial evidence to support it).

Dr. Tabora argues that the Board relied on hearsay evidence. In particular, Dr. Tabora asserts that Dr. Pent testified about the records concerning the two patients who were assigned a physical status of 3 and about the surgeon's notes concerning the pleural tent surgical procedure, but did not provide those records or notes to the Board.

█ The question before this court is not whether Dr. Pent's testimony concerning those records and notes would have been admissible in a judicial proceeding; the question is whether his testimony was probative. A.R.S. § 41–1010(A)(1). Dr. Tabora did not object during the informal interview to Dr. Pent's testimony about those

records and Dr. Tabora has not claimed that Dr. Pent's testimony was inaccurate. *See Justice v. City of Casa Grande,* 116 Ariz. 66, 68, 567 P.2d 1195, 1197 (App.1977) (evidence otherwise inadmissible may be considered by an administrative agency where it is admitted without objection); *Employment Security Commission v. Myers,* 17 Ariz.App. 87, 90, 495 P.2d 857, 860 (1972) (finding no error in the introduction of hearsay evidence because the appellant admitted all the material testimony that was alleged to be hearsay).

In attempting to refute the finding of a "pattern" of excessive billing, Dr. Tabora argues that the Board made no specific finding that two patients were improperly classified as having a physical status of 3 or that a thoracoplasty was not performed.

We note that in its findings, the Board summarized the evidence of excessive billing: it referred to the cases in which Dr. Tabora charged a patient for extra units and charged two patients for the same period of time as evidencing "unreasonably high unit charges"; it referred to the cases in which Dr. Tabora charged patients based on erroneous classifications of the patients' physical status as evidencing "inaccurately assigned high value classifications for ... patients' physical status"; and it referred to the case in which Dr. Tabora charged a patient for the thoracoplasty that was not performed as evidencing "inaccurately assigned high value classifications for surgical procedures attended...."

█ Dr. Tabora cites no statute or administrative rule requiring a more detailed finding. Absent such a statute [4] or rule, the Board's finding of excessive billing is sufficient to support the Board's conclusion of unprofessional conduct. *See Cox v. Pima County Law Enforcement Merit System Council,* 25 Ariz.App. 349, 350, 543 P.2d 470, 471 (1975).

---

4. Dr. Tabora does not argue that A.R.S. § 41–1011, which requires a concise and explicit statement of the underlying facts supporting the

findings, applied to the informal interview procedure.

■ Dr. Tabora argues that the Board found that his overlapping attendance of two patients only violated A.R.S. § 32–1401(8)(*o* ), prohibiting harmful or dangerous conduct. As previously noted, two Board members stated their concern that Dr. Tabora, by attending two patients at once, was charging for services that he did not provide. Thus, we conclude that the Board may properly have found that episode to constitute "unreasonably high unit charges" as well as harmful conduct.

■ With respect to the thoracoplasty case, Dr. Tabora argues that it was a common practice among anesthesiologists to rely on the surgeon's statements concerning intended surgical procedures. The Board members may not have believed that the surgeon told Dr. Tabora that he intended to perform a thoracoplasty.[5] Furthermore, one Board member found it inconceivable that Dr. Tabora could administer anesthetic and not know that a thoracoplasty was not performed. Finally, Dr. Tabora did not explain during the informal interview that he relied on the surgeon's statement because it was common practice among anesthesiologists to do so. We conclude that sufficient evidence was presented to support the Board's findings and its conclusion of unprofessional conduct.

### (2) ORDER OF RESTITUTION

We now turn to a discussion of the order of restitution entered by the board. The superior court concluded that Dr. Tabora did not receive adequate notice prior to the informal interview that such a broad restitution order might be entered. We agree. Dr. Tabora was led to believe that the Board's investigation and disciplinary action would be restricted to the 1983 complainant and February 1983 cases. The letter of October 7, 1983, from the Board to Dr. Tabora clearly established the scope of the informal interview:

> The Board's September 19, 1983 letter requesting you to appear for an informal

interview indicates that other patients besides Mr. Quist would be discussed with you by the Board.

> Please be advised that the Board will be reviewing all cases handled by you during February, 1983.

The letter of September 19, 1983 referred to "Clifford Quist [the 1983 complainant] and other patients which were discussed with you by Doctor Pent." The "other patients," according to Dr. Pent's opening remarks at the informal interview, were those seen by Dr. Tabora in February, 1983. Finally, the subpoena issued by the Board required production of records for "all patients under [Tabora's] care for the period FEBRUARY, 1983."

■ We conclude that the evidence supports the trial court's determination that Dr. Tabora did not receive adequate notice that the Board might enter an order "covering the entire calendar year 1983, and requiring him, without further specification, to undertake to conduct the type of review and restitution therein ordered." In addition to our agreement with the trial court that notice was inadequate, we perceive fundamental problems with the nature of the restitution order. In essence, the Board ordered Dr. Tabora to investigate and prosecute himself, thereby leaving open the possibility of further discipline if he fails to complete the review and restitution tasks to the Board's satisfaction.

■ In the petition for rehearing, Dr. Tabora argued that "[t]he specific sanctions imposed by the Board are so vague as to be unreasonable with absolutely no way for Dr. Tabora to ascertain compliance with the Board order." If Dr. Tabora fails to comply with the restitution order to the Board's satisfaction, then the Board may enter additional sanctions pursuant to A.R.S. §§ 32–1451(F)(4) and (I). An order, issued by a state administrative agency, denies due process of law in violation of the fourteenth amendment of the United States

---

5. The transcripts of the informal interview and petition for rehearing indicate that the Board may have doubted Dr. Tabora's credibility.

Constitution and article 2, § 4 of the Arizona Constitution when it is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application. *Cohen v. State*, 121 Ariz. 20, 26, 588 P.2d 313, 319 (App.1977), *adopted in part, vacated in part*, 121 Ariz. 6, 588 P.2d 299 (1978).

Based on our review of the transcripts from the informal interview and the petition for rehearing, we conclude that the appellee, as he reviews his records pursuant to the order, will have to guess at the meaning of the order and may apply it differently than the Board would, thereby exposing himself to further discipline by the Board.

One example will illustrate appellee's predicament. He was ordered to find cases in which the patient was billed according to an erroneously high physical status classification, but appellee stated that "[s]ome people will classify a patient as a different physical status according to their own evaluation of the patient and I don't think in any case my classification of physical status on any of these patients has no ... I mean it is supported by whatever findings I found." The Board mentioned a specific case but then dismissed further discussion to avoid getting "bogged down" with individual cases. The order directs appellee to correct the status classifications which he formulates, in the first instance, by his own subjective evaluation.

At the very least, the Board should have delineated the steps it expected appellee to take to recalculate his bills and should have defined the disputed terms and practices which had been discussed superficially, but not resolved, at the informal interview. Additionally, the Board should have appointed one of its members to enforce the order rather than placing appellee in the position of investigating and incriminating himself, or, for that matter, acquitting himself.

The judgment of the trial court is affirmed in part and reversed in part.

JACOBSON, P.J., and CORCORAN, J., concur.